### In re GROSS PLUMBING & HEATING CO., INC. et al. d/b/a Niagara Plumbing Supplies, Debtor.

### Bankruptcy No. 91–12445 K.

United States Bankruptcy Court,
W.D. New York.

Oct. 27, 1992.

Jack Getman, Goldman, Costa, Getman & Biryla, Buffalo, N.Y., for debtor.

Michael W. Dush, New York City, for the State Ins. Fund.

MICHAEL J. KAPLAN, Bankruptcy Judge.

This matter comes before the Court on an Order to Show Cause obtained by the Chapter 11 debtor-in-possession ("D–I–P"), against the State Insurance Fund of the State of New York ("Fund"). The D–I–P seeks to prevent the Fund from canceling the D–I–P's Worker's Compensation coverage due to its failure to pay $46,878 in postpetition premiums. The D–I–P argues that it has a $46,671 credit with the Fund as a result of a Fund-declared insurance dividend, and that that dividend is a postpetition asset which the Fund either should turn over to the D–I–P (if the D–I–P provides other assurance of payment for postpetition coverage) or should credit against the postpetition unpaid premiums. The D–I–P's alternative argument is that if the dividend was earned pre-petition, it was not earned by the debtor in the same legal capacity as that in which it owed premiums—it was earned by the group, and therefore that set-off should not be allowed under 11 U.S.C. § 553. For its part, the Fund argues that the dividend was earned pre-petition; that it should be applied to the D–I–P's *pre*-petition premium arrearages; and that it should be permitted to cancel further coverage unless the debtor arranges for payment of postpetition premiums.

The debtor-in-possession invites the Fund and this Court to characterize the present dispute as one implicating the set-off provision of the Bankruptcy Code, 11 U.S.C. § 553. The Fund has apparently accepted that invitation, but the Court will not. The Court holds that 11 U.S.C. § 553 and a fundamental policy underlying 11 U.S.C. § 541(a) command that the State Insurance Fund be allowed to credit the sum of $46,-671.52 (which had been declared as a dividend to the debtor regarding worker compensation insurance for the period May 1, 1990 to April 30, 1991) against the debtor's $74,405.59 pre-petition indebtedness for worker compensation insurance coverage.

## FACTS

Section 90 of the New York State Workers' Compensation Law, entitled "Dividends," provides as follows:

Policyholders insured in the State Insurance Fund may be divided into such groups as shall be equitable for the purpose of accounting and declaration of dividends, but for the purpose of paying compensation the State Fund shall be deemed one and indivisible. Separate accounts shall be kept of income and of losses and expenses incurred, including contributions to catastrophe surplus and

reserves adequate to meet anticipated losses and carry all claims to maturity, for each such group. *If such accounting shows a balance remaining to the credit of the group at the close of any policy period, which shall be deemed to be safely and properly so applied, there may be credited or paid to each individual member of such group such proportion of such balance as the amount of his earned premium sustains to the total earned premium of the group for the period for which the accounting is made.* If any member who has withdrawn from the group would otherwise have been entitled to such a dividend, the same may be credited or paid to him. (Emphasis added) N.Y.Work.Comp.Law § 90 (McKinney 1992).

Section 92 of that same title of law, entitled "Payment of Premiums" provides:

Workmen's compensation insurance premiums for any policy period shall, and disability benefits insurance premiums for any period may, be paid into the State Insurance Fund at the beginning of the period according to the estimated expenditure of wages for the period. At the end of the period an adjustment of the premium shall be made according to the actual expenditure of wages. If such adjusted premium is more than the premium paid at the beginning of the period, the employer shall pay difference immediately upon notification of the amount of the true premium and the difference due. If such adjusted premium is less than the premium paid in advance, the employer shall, at his option, receive either a refund of the difference or a credit of the amount thereof on his account with the State Fund. (Underline added) N.Y.Work.Comp.Law § 92 (McKinney 1992).

The debtor in this case is a plumbing contractor. It is a member of the "Plumbing and Heating Contractors Safety Group" of the State of New York pursuant to Section 90 of the Work.Comp.Law. That group operates under express rules and regulations, paragraph 11 of which provides:

DIVIDENDS—Dividend payments will be made pro-rata on the basis of the earned premiums. Before making payment of any dividend to any policyholder, the amount of his indebtedness, if any, for unpaid premiums will first be deducted. All dividends and premiums returns will be paid or credited by the State Fund directly to the individual members of the Group.

Safety Trade Group No. 455, Contract at ¶ 11.

The debtor filed its Chapter 11 Petition on July 12, 1991 and has since continued to operate as a debtor-in-possession. On that date, it appeared that the debtor owed $74,405.59 to the State Insurance Fund. An April 28, 1992 audit pursuant to Section 90 of the Work.Comp.Law, however, established that there was a "balance remaining to the credit of the group" (in Work.Comp. Law § 90 terms) for the one year period May 1, 1990 to April 30, 1991, and that the debtor's share of such credit would be $46,671.52.

The State Insurance Fund has continued to provide workers compensation insurance for the debtor since the Petition was filed. The coverage continued despite the fact that the debtor made no payments either for pre-petition indebtedness to the Fund or post-petition indebtedness.[1]

The debtor initially contended that the "dividend" was earned and declared post-petition and should either have been sent to the debtor or applied to its post-petition insurance premium. It further contended that the automatic stay provisions, 11 U.S.C. § 362(a)(3), (6) and (7) barred the Fund from applying the dividend to the pre-petition indebtedness owed by the debtor.

■ At oral argument and in light of the Fund's responsive papers, the debtor did not seriously press its claim that the "divi-

---

**1.** The Court has ordered the debtor to pay for post-petition coverage on a monthly basis during the pendency of the present dispute.

dend" was earned post-petition. Rather, the debtor argued that the mutuality requirement of 11 U.S.C. § 553 was lacking. It stated "the debtor allegedly owes the State Fund certain premium amounts for a pre-petition insurance policy, the amount which State Fund seeks to offset against this debt is a dividend refund which was issued on behalf of Plumbing and Heating Contractors, designated as Safety Group No. 455 ... [the debtor] and the Safety Group are separate and distinct entities and for purposes of set-off are not in the same capacity." Gross Reply at 2, 3. Thus, it appears that the debtor has conceded that the "dividend" is a pre-petition matter,[2] but disputes its amenability to set-off on mutuality grounds.

The Fund prays that it be allowed to "set off" its pre-petition claim against the debtor by the value of the Group Dividend for the 5/1/90–5/1/91 pre-petition period, and that the Fund be allowed to cancel the debtor's post-petition policy "unless arrangements for payment of the outstanding [post-petition] premium balance of $46,878.46 are made by the debtor before ..." the policy's non-payment cancellation date. State's Affirmation at 7.

## ANALYSIS

Although the Court could simply hold that in light of both N.Y.Work.Comp. Law and the contract, the prepetition dividend and the premiums were "mutual" debts and authorize set-off under 11 U.S.C. § 553, it will not. The Fund prevails for a reason not raised by either party.

Both parties mischaracterize the present dispute as involving a right of set-off. The terms set-off and off-set are, unfortunately, often misused so that matters not involving reciprocal debts are made to somehow resemble a set-off. If one believes that a given instance of reciprocal "debits" and "credits" involves reciprocal "debts,"

then 11 U.S.C. § 553 seems appealing. Accordingly, one may find lurking in section 553 a number of ways to reach the wrong result. For example, one may challenge each of the many factors that establish mutuality in order to attack the permissibility of the set-off in a bankruptcy context, or one may examine the question of section 553(b) "improvement in position" as well. Furthermore, the analysis and the perspective from which it proceeds may change with the identity of the bankrupt as being the buyer or the seller. At some point, 11 U.S.C. § 553 could be applied to ridiculous ends.

For example, if Seller A charges Buyer A $100 for an item purchased on credit, then discovers that Buyer A should have only been charged $90 for the item and so adjusts the outstanding balance to $90 rather than $100, it seems clear that no set-off is involved. The transaction merely corrects a charge made to Buyer A's account. The bankruptcy of one party or the other should not be relevant to the outcome. The result is dictated by 11 U.S.C. § 541(a) which, in bringing into a bankruptcy estate all of the debtor's legal or equitable interests in property, leaves that property "subject to all claims and defenses which might have been asserted against the [debtor] but for the filing of the petition."[3] To require the seller to pay $10 to the bankruptcy estate and stand in line to receive a dividend (if any) on the $90 claim would be absurd, not because there are "mutual" debts and credits which should be set off under 11 U.S.C. § 553, but because the debtor never brought to the estate any right to receive $10, nor did anything happen post-petition to give the estate such a right. The Seller owes no money to the Buyer, merely a duty to adjust the charge from $100 to $90.

Similarly, if Buyer B gives Seller B a $50 deposit on the purchase of an item for

---

2. In any event, the Court is satisfied, based on the statute and the contract, that the "dividend" was earned *pre*-petition.

3. *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). For comprehensive discussion of this ancient proposition and its interplay with the Trustee's "avoiding powers" and other provisions that might seem to be exceptions to the proposition, see 3 Harold Remington, Remington on Bankruptcy §§ 1412 et seq. (James M. Henderson Ed. 1957 Ed.), and cases cited therein.

Buyer B to deliver, then no set-off is involved when after delivery Buyer B takes a $50 credit toward the purchase price, even if Seller B's bankruptcy has intervened. To grant that credit is not matter of preference theory (under 11 U.S.C. § 547) or set-off theory (under 11 U.S.C. § 553) or executory contract theory (under 11 U.S.C. § 365). Rather, Buyer B is entitled to the credit because under § 541 and pertinent state law, the estate's right is to receive "the balance of" the purchase price upon delivery of the goods; stated otherwise, the estate's rights against the buyer are subject to the buyer's defense of having made partial payment.

A final example that is much akin to the matter at bar: if I take delivery, on credit, of an item for which a cash rebate is offered by the seller, but decline to pay the seller for the item, should I be entitled nonetheless to collect the "rebate" in full? Similarly, should my other creditors (represented by a Trustee) be allowed to collect it if I am a bankrupt? The obvious answer does not follow from any provision of the Bankruptcy Code, but from the fact that my right to the "rebate" is, as a matter of state law, dependent on my having fully paid for my purchase. This is what a "rebate" means, in common parlance. The case at bar asks whether that result should be different if I claim to be entitled to the rebate as a member of a group upon whose purchasing history the size of the rebate is determined. (Equate "dividend" with "rebate.")

Here, the closest that either party comes to a correct characterization of the problem is found in the affirmation of Michael W. Dush, counsel for the Fund, in which he cites the case of *Braniff Airways, Inc. v. Exxon Company, USA*, 814 F.2d 1030 (Fifth Cir.1987) for the proposition (with which this Court agrees) that a claim is not transformed from "a pre-petition claim" to "a post-petition claim" simply because it is not computed until after the petition is filed. More significant, however, is the fact that the *Braniff* case stated its accord with the decision of the Bankruptcy Court in the case of *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83 (Bankr.D.Neb.1986)—

a case highly analogous to that at bar. In that case, a broker advanced (from its own funds, to an insurer) the debtor's premium for various insurance needs. It was permitted under "recoupment theory" (*not* set-off theory) to keep unearned premiums that were returned by the insurer, for application to the debtors' unpaid liability to the broker for those very same premiums.

Furthermore, the *Nickerson* court relied in part on a similar holding in the case of *In re Fernandes Supermarkets, Inc.*, 1 B.R. 299 (Bankr.D.Mass.1979), a case decided under the Bankruptcy Act of 1898. Other than the issue of trade groups, that case is identical to the case at bar inasmuch as it dealt with workmen's compensation coverage computed in a manner very similar to that presented here.

In that case, like the *Nickerson* case, there was an intermediate agent who made the premium payments for the debtor. The Court described the fact situation as follows: there is no fixed premium, rather, an initial estimated premium in the nature of a deposit is required by the insurer. At the end of the policy period, the policyholder's payroll is audited and the actual earned premium is calculated, resulting in either an additional billing or a return of the excess estimated premium. In the *Fernandes* case, because of the closing of stores and reduction in employees, the actual earned premium was substantially less than the initial estimates, resulting in the refunded premiums in question.

> All of the pre-filing estimate premiums were paid by the agent when he was not paid by the policyholder. The agent, however, was ultimately only required to pay the actual premium and any excess was in fact a return of his own funds being held on the agent's account by the insurer in effect as an excess deposit. Under these circumstances both logic and equity would require that the agent be able to recover his own funds which were paid to the insurance company for the specific and limited purpose of covering the ultimate actual earned premium and which were intended to become the property of the insurance company only

to the extent of the actual earned premium. (Underline added)
*Fernandes* at 301.

It is useful to note that the *Fernandes* Court does not appear to have reached its decision as a matter of set-off policy. Rather, the Court stated "this conclusion is buttressed by the agent's right of set-off under Section 68a of the [former] Bankruptcy Act. The agent and the debtor shared a mutuality as to the premium obligation which had been advanced by the agent on behalf of the debtor." Id. at 302 (underline added).

These cases suggest the appropriate result for the matter at bar, for they teach that when one has rendered a service to the debtor, has not been paid therefor, and a right to a refund (or "dividend," or "rebate," etc.) emerges out of that service, then the suffering party is entitled to the credit. This is so regardless of whether the transactions fit neatly into the provisions of bankruptcy law that govern set-offs. It does not matter whether one labels this as "recoupment," "recovery of one's own funds," or merely as a matter of "logic and equity."

Here, the State Insurance Fund is in no way "indebted" to this debtor. Where there is no "debt" running in favor of the debtor, there can be no issue of set-off: hence, there is no question of "mutuality," or of the timing of accrual of the dividend by its application by the Fund. It is implicit in sections 90 and 92 of the N.Y.Work. Comp.Law and section 11 of the Group Contract Rules and Regulations that although accounting and declaration of dividends is done on a group basis, any remaining balance to the credit of the group is to be "credited or paid to each individual member of such group" on the basis of whether that individual member has or has not pre-paid the premiums required by law. Stated otherwise, if the statute did not require dividends to be computed on a group basis, rather than an individual basis, an analysis based individually on this debtor would not have resulted in the declaration of any dividend at all; rather, it would have resulted in an adjusted bill,

reflecting the net indebtedness of the debtor to the Fund.

Thus the essential question posed here is whether the existence of the group necessitates a different result when there is a filing under the Bankruptcy Code.

The answer, of course, is quite the opposite. The Bankruptcy Code itself requires that the result be precisely the same. It does so in two ways. The first is that cited in the illustrations examined above: whatever rights to receive a "dividend" that the debtor brought into the estate, were not cleared of the Fund's defense of non-payment of premiums. "Dividend" here means "rebate"—one has no right to receive it unless one has (over) paid. Second, 11 U.S.C. § 553 generally *preserves* set-off, but strikes down certain abusive or inequitable instances thereof. It is a shield, not a sword. To construe the trade groups, the statute, and the contract in such a way as to ensnare the Fund to pay $46,671.52 in full and stand in line for payment of a $74,405.59 debt would be a contrivance not sanctioned by section 553 itself.

## CONCLUSION

If the application of debits and credits does not logically involve reciprocal "debts" in the classic sense, then 11 U.S.C. § 553 should be totally ignored. The answer may lie totally in 11 U.S.C. § 541. The Court concludes that by applying the "dividend" to the debtor's pre-petition debt, the Fund is merely calculating, for the first time, the actual amount of the debtor's pre-petition obligation for compensation insurance premiums. Such an adjustment constitutes an amendment to the Fund's pre-petition claim against the debtor, and does not violate the automatic stay unless it is coupled with a demand for payment of the pre-petition debt.

In its opposing papers, the Fund asks permission to cancel the debtor's post-petition workers compensation policy unless the debtor makes arrangements for the payment of the outstanding post-petition

premium balance of $46,878.46.[4] The debtor has not had the opportunity to make arrangements with the Funds in light of the Court's decision today. Therefore, the Fund's motion to lift stay will be set for telephonic status conference as soon as counsel for the Fund requests it.

SO ORDERED.

---

**4.** An alternative prayer in the debtor's moving papers sought application of the dividend to the post-petition insurance premiums; had this been granted, the debtor would be virtually current for the post-petition period.